1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JAMES MARTIN BACA,                        No.  2:22-cv-1481 WBS CSK P

12                    Petitioner,

13         v.                                    FINDINGS & RECOMMENDATIONS

14    JAMES ROBERTSON,

15                    Respondent.

16

17         Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

18    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2019 conviction for first

19    degree murder with special circumstances.  Petitioner claims that there was insufficient evidence

20    to support his conviction, and claims his Sixth and Fourteenth Amendment rights were violated

21    when the state court excluded certain impeachment evidence.  (ECF Nos. 1 at 5, 7, 17-7 at 28.)

22    After careful review of the record, this Court concludes that the petition should be denied.

23    I.    PROCEDURAL HISTORY

24         On May 10, 2019, a jury found petitioner guilty of first degree murder, with a gun

25    enhancement and the special circumstance that the murder was committed during the commission

26    of a robbery, two counts of robbery with gun enhancements, and being a felon in possession of a

27    firearm.  People v. Baca, Case No. 17FE005228; Clerk's Transcript ("CT") at 277-80 (ECF No.

28    17-1 at 320-23).  On June 28, 2019, petitioner was sentenced to life without the possibility of

1    parole, plus fifty-eight years and four months.  Id.

2          Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

3    District.  The Court of Appeal affirmed the conviction on March 29, 2021.  People v. Baca, Case

4    No. C089946 (ECF No. 17-10).

5          On April 16, 2021, petitioner filed a petition for review in the California Supreme Court.

6    People v. Baca, Case No. S268270 (ECF No. 17-11).  Petitioner raised two claims:

7    (1) insufficient evidence supported petitioner's conviction for robbery and felony-murder and the

8    true finding on the felony-murder special circumstance; and (2) petitioner was denied his rights to

9    a fair trial, to present a defense, to confront witnesses and to due process of law by the trial

10   court's refusal to allow petitioner to introduce facts underlying Archuleta's prior convictions and

11   character evidence relating to her credibility.  Id.  On May 26, 2021, the California Supreme

12   Court denied the petition for review without comment.  Id. (ECF No. 17-12).

13         On August 22, 2022, petitioner filed the instant petition which contained three additional,

14   unexhausted claims (claims 3, 4 and 5).  Petitioner was advised of his options in pursuing his

15   unexhausted claims, but despite multiple opportunities, petitioner failed to support his motion for

16   stay under Rhines v. Weber, 544 U.S. 269 (2005).  (ECF Nos. 9, 11 & 12.)  Petitioner's

17   unexhausted claims were stricken on March 30, 2023, based on petitioner's concession that such

18   claims were unexhausted.  (ECF No. 13.)  Thus, this case proceeds only on claims one and two.

19         Respondent filed an answer.  (ECF No. 18.)  Petitioner did not file a reply.

20   II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

21         After independently reviewing the record, this Court finds the appellate court's summary

22   accurate and adopts it herein.  In its unpublished memorandum and opinion affirming petitioner's

23   judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District

24   provided the following factual summary:

25              *The Robbery and Murder*

26              In March 2017 Temme was dating defendant, who was a tattoo artist

27   _____

28   [1]  The facts are taken from People v. Baca, No. C089946 (March 9, 2021), a copy of which was
     lodged by respondent as Lodged Document #10.  (ECF No. 17-10).

and drug dealer. Temme and Montoya, who was Temme's former girlfriend, assisted defendant in selling drugs. Defendant always carried a loaded gun for protection. In March 2017, he carried a .45 caliber handgun.

On March 18, 2017, Temme and Montoya got into a heated argument in the presence of defendant and Temme's aunt, Melodie Clark.[FN2] Immediately after Montoya left the area, Temme said, "I am going to kill that bitch." Defendant replied, "Baby, we can make that happen," and then pulled a gun from his waistband.[FN3] Thereafter, Clark, who was Montoya's friend, warned her to stay away from Temme, explaining that defendant had a gun and that he and Temme might do something to her.

[FN2 Three days earlier, Temme sent defendant a text message that read: "This bitch is really fucking pushing me so just know I do love you and I'm so sorry that shits been crazy tonight, but I'm beyond . . . good and I'm not about to be in this car with her anymore I'll do something stupid." It is unclear from the record whether Temme was referring to Montoya in this message.]

[FN3 On March 6, 2017, Montoya sent defendant a message on Facebook indicating that she thought it was great that he and Temme were friends but noted that Temme was her "wife." In response, defendant said that he did not want to have sex with Temme, explaining that he did not "love her like that" and would not disrespect Montoya. During their exchange of messages, defendant told Montoya that he "sell[s] drugs [and] shoot[s] people."]

The next morning, Montoya hung out with her friend, Archuleta. They drank alcohol, used drugs together, and talked about Montoya being on the "outs" with Temme. At one point, Archuleta mentioned that she wanted a tattoo. In response, Montoya indicated that defendant was a good tattoo artist and showed her some photographs of his work. When Montoya called Temme, she was told that the tattoo Archuleta wanted would cost $30. Thereafter, Montoya contacted Temme, who arranged for defendant to give Archuleta a tattoo and to sell Montoya and/or Archuleta drugs.

Later that day, Montoya drove Archuleta and her friend, Ikon, to a gas station to meet up with Temme and defendant. They arrived around 8:30 p.m. Temme approached Montoya's car and said that defendant would not give Archuleta a tattoo because Montoya and Archuleta "weren't supposed to bring anybody with [them]." After Montoya dropped Ikon off at a nearby convenience store, she drove to a different gas station and picked Temme and defendant up. At the direction of Temme, Montoya eventually drove the group to defendant's motel room at the Surf Motel in Sacramento. They arrived at 9:07 p.m.

Defendant entered the motel room first, followed in order by Temme, Archuleta, and Montoya. After Montoya entered the room and sat down in a chair, Temme closed the door. As soon as the door was shut, defendant pulled out a gun, pointed it in the direction of Montoya and Archuleta, and ordered them to place their cell phones

on the table.  According to Archuleta, Temme did not seem surprised by defendant's actions.

After Archuleta placed her cell phone on the table, Temme said, "car key," which defendant repeated as he approached Montoya with his gun pointed at her.  As Montoya started to speak, defendant shot her in the face.  Temme and defendant immediately went through Montoya's pockets.  When defendant turned and looked at Archuleta, she gave him all the money she had.  Temme or defendant grabbed Archuleta's cell phone and they fled the murder scene in Montoya's car.  At defendant's direction, Temme drove to the San Francisco Bay Area.  According to Archuleta, Montoya did not do anything to provoke the shooting.

*Apprehension of Defendant and Temme*

The following morning, Archuleta spoke with homicide detectives from the Sacramento County Sheriff's Department about the shooting.  Around 5:10 p.m., a detective with that department spotted Montoya's car in Redwood City; Temme was driving and defendant was riding in the front passenger seat.  When a Redwood City police officer attempted to stop the car, Temme sped off.  A high-speed chase ensued, during which defendant threw a cell phone out the window.  When Temme's path was blocked by a patrol car, defendant and Temme got out of Montoya's car and fled on foot.  They were apprehended shortly thereafter.  A loaded firearm magazine was found on defendant's person and a loaded handgun was found along the route defendant had taken while fleeing on foot.  Three cell phones were found in the back of Montoya's car.

*The Investigation*

When homicide detectives responded to the scene of the shooting, Montoya was slumped over in a chair holding a closed pocketknife in her right hand.  An autopsy revealed that she died of a single gunshot to the head.  A .45 caliber spent bullet casing was found in the motel room.  A firearms expert determined that the casing and the bullet that killed Montoya had been fired from the gun found when defendant and Temme were apprehended.

A review of security camera footage revealed that defendant, Temme, Montoya, and Archuleta arrived at the Surf Motel in Montoya's car at 9:07 p.m. on the evening of the shooting.  Montoya, who was the last person to enter defendant's motel room, entered the room at 9:08 p.m.  Less than a minute after Temme closed the door, defendant and Temme left the room and fled the area in Montoya's car.  At 11:27 p.m., defendant sent a text message to someone using the name "Los Cervantes" indicating that he needed help "really bad."  The following afternoon, defendant sent another text message to Los Cervantes stating that he needed "plates."

During a jail visit following the shooting, Temme admitted to Clark (her aunt) that she took everything Montoya had on her person, including her car key.  Temme also said that she loved defendant and that Archuleta was only alive because she had instructed defendant

not to harm her.  As for Montoya, Temme stated, "I don't give a shit about that bitch.  Fuck her."

In late April 2019 Temme passed two notes to other inmates, instructing them to warn Archuleta that she was aware Archuleta intended on testifying against her and defendant, and that she would be "catching up with [Archuleta] real soon."  Temme referred to Archuleta as a "lame snake ass snitching ass bitch" and stated that she would be "gunnin" for Archuleta.[FN4]  Beginning on May 1, 2019, Archuleta testified as a prosecution witness.  At that time, Archuleta was in custody for a felony she committed in 2018.

[FN4 The letters were written by "Harliquinn Baby Girl" and "B.G." Temme went by the nickname "Baby Girl."]

*Defendant's Testimony*

Defendant testified at trial; he claimed he shot Montoya in self-defense during a drug deal gone bad.  He denied that the shooting occurred during a robbery of Montoya and Archuleta.

Defendant gave the following account of the shooting and the events leading up to the shooting:  In the early evening of March 19, 2017, Temme told him that she had arranged a drug deal with Montoya and for him to give another person a tattoo.  When he and Temme met Montoya at a gas station, he became upset and walked away because he thought he was being set up, as he believed the two people with Montoya (i.e., Archuleta and Ikon) were men.[FN5]  After Montoya dropped Ikon off, she and Archuleta met up with defendant and Temme at a different gas station.  At Temme's direction, Montoya eventually drove the group to defendant's motel room at the Surf Motel.  Defendant entered the room first followed by Temme, who stood in the doorway.  Although defendant was still worried that he was being set up, he weighed out some drugs and then started setting up his tattoo equipment.  At that moment, Archuleta entered the room, threw $30 on the bed, and grabbed the drugs.  Montoya then entered the room and Temme closed the door.  Montoya sat down in a chair and said, "Break yourself," which defendant understood to mean "give up what you got."  Montoya then reached toward her right side and started to stand up.  Because defendant believed that she was trying to rob and kill him, he immediately pulled out his gun and shot her.  Defendant then grabbed his tattoo equipment, the $30 Archuleta had thrown on the bed for the drugs, and the key to Montoya's car, which was on a table.  He and Temme then fled to the San Francisco Bay Area in Montoya's car.  Temme drove and he sat in the front passenger seat.

[FN5 During his testimony, defendant explained that he had been the victim of two attempted robberies during drug deals.  In one of those incidents, he was shot in the leg and one of his friends was shot and killed.  In the other incident, he was shot in the ankle.]

As for his apprehension the next day, defendant explained that a high-speed car chase ensued after he instructed Temme to "get out of there" when police officers started to follow them.  He further

1    explained that he fled on foot from the pursuing officers after Temme
2    stopped Montoya's car.  He admitted that he tossed his gun during
     the foot chase because it was "slowing [him] down."

3    *Charges, Verdicts, and Sentencing*

4    In January 2018 the People charged defendant with two counts of
     robbery with gun enhancements (Pen. Code, §§ 211, 12022.53, subd.
5    (c), (d))[FN6], one count of first degree murder (§ 187, subd.
     (a)),[FN7] with the special circumstance that the murder was
6    committed during the commission of a robbery (§ 190.2, subd.
     (a)(17)(A)), as well as a gun enhancement for discharging a firearm
7    and causing the death of another (§ 12022.53, subd. (d)) and being a
     felon in possession of a firearm (§ 29800).  Defendant had previously
8    suffered a strike.

9    [FN6 Undesignated statutory references are to the Penal Code.]

10   [FN7 "Murder is the unlawful killing of a human being . . . with
     malice aforethought." (§ 187, subd. (a).)   "All murder that is
11   perpetrated by . . . willful, deliberate and premeditated killing . . . or
     that is committed in the perpetration of, or attempt to perpetrate"
12   certain specified felonies, including robbery, "is murder of the first
     degree."  (§ 189, subd. (a).)   "Felony murder and premeditated
13   murder are not distinct crimes, and need not be separately pleaded."
     (*People v. Nakahara* (2003) 30 Cal.4th 705, 712.)]

14

15   In May 2019 a jury found defendant guilty on all counts and found
     true the felony-murder special circumstance allegation as well as the
16   firearm enhancement allegations.   The trial court sentenced
     defendant to an aggregate term of life without the possibility of
17   parole (LWOP) plus 58 years four months in state prison: LWOP for
     the murder of Montoya, 25 years to life for the associated firearm
18   enhancement, consecutive 12-year terms for the robbery convictions
     with additional 20- and 25-year terms for the gun enhancements on
19   the respective counts, with the robbery of Montoya and associated
     (25-year) gun enhancement stayed pursuant to section 654, and a
20   consecutive term of 16 months for being a felon in possession of a
     firearm.

21

22   (*People v. Baca*, slip op. at 2-7.)

23   III.    STANDARDS FOR A WRIT OF HABEAS CORPUS

24       An application for a writ of habeas corpus by a person in custody under a judgment of a

25   state court can be granted only for violations of the Constitution or laws or treaties of the United

26   States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation

27   or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire,

28   502 U.S. 62, 67-68 (1991).

1       Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act

2  of 1996 ("AEDPA"), sets forth the following standards for granting federal habeas corpus relief:

3              (d) An application for a writ of habeas corpus on behalf of a person
               in custody pursuant to the judgment of a State court shall not be
4              granted with respect to any claim that was adjudicated on the merits
               in State court proceedings unless the adjudication of the claim -

5
               (1) resulted in a decision that was contrary to, or involved an
6              unreasonable application of, clearly established Federal law, as
               determined by the Supreme Court of the United States; or
7
               (2) resulted in a decision that was based on an unreasonable
8              determination of the facts in light of the evidence presented in the
               State court proceeding.
9

10  28 U.S.C. § 2254(d).

11       For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of

12  holdings of the Supreme Court at the time of the last reasoned state court decision.  Thompson v.

13  Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 565 U.S. 34, 39-40

14  (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S.

15  362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly

16  established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859

17  (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may

18  not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a

19  specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S.

20  58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37, 48-49 (2012) (per curiam)).  Nor may it be

21  used to "determine whether a particular rule of law is so widely accepted among the Federal

22  Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."  Id.  Further,

23  where courts of appeals have diverged in their treatment of an issue, there is no "clearly

24  established federal law" governing that issue.  See Carey v. Musladin, 549 U.S. 70, 77 (2006).

25       A state court decision is "contrary to" clearly established federal law if it applies a rule

26  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

27  precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

28  Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant

7

1   the writ if the state court identifies the correct governing legal principle from [the Supreme

2   Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[2]

3   Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams v. Taylor, 529 U.S. at 413); see

4   also Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, "a federal habeas court

5   may not issue the writ simply because that court concludes in its independent judgment that the

6   relevant state-court decision applied clearly established federal law erroneously or incorrectly.

7   Rather, that application must also be unreasonable."  Williams v. Taylor, 529 U.S. at 411; see

8   also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough

9   that a federal habeas court, in its independent review of the legal question, is left with a firm

10  conviction that the state court was erroneous") (internal quotations and citation omitted).  "A state

11  court's determination that a claim lacks merit precludes federal habeas relief so long as

12  'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v.

13  Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

14  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

15  must show that the state court's ruling on the claim being presented in federal court was so

16  lacking in justification that there was an error well understood and comprehended in existing law

17  beyond any possibility for fair-minded disagreement."  Id. at 103.

18      If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

19  court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

20  527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

21  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

22  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

23  considering de novo the constitutional issues raised.").

24      The court looks to the last reasoned state court decision as the basis for the state court

25  judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

26  ────────────────

27  [2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
    presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28  384 U.S. 628, 638 (9th Cir. 2004)).

8

1   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

2   previous state court decision, this Court may consider both decisions to ascertain the reasoning of

3   the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

4   federal claim has been presented to a state court and the state court has denied relief, it may be

5   presumed that the state court adjudicated the claim on the merits in the absence of any indication

6   or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption

7   may be overcome by a showing "there is reason to think some other explanation for the state

8   court's decision is more likely."  Id. at 99-100.  Similarly, when a state court decision on

9   petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

10  habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

11  merits.  Johnson v. Williams, 568 U.S. 289, 298-301 (2013) (citing Richter, 562 U.S. at 98).  If a

12  state court fails to adjudicate a component of the petitioner's federal claim, the component is

13  reviewed de novo in federal court.  See, e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003).

14      Where the state court reaches a decision on the merits but provides no reasoning to

15  support its conclusion, a federal habeas court independently reviews the record to determine

16  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

17  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

18  review of the constitutional issue, but rather, the only method by which we can determine whether

19  a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

20  reasoned decision is available, the habeas petitioner has the burden of "showing there was no

21  reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

22      A summary denial is presumed to be a denial on the merits of the petitioner's claims.

23  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

24  just what the state court did when it issued a summary denial, the federal court reviews the state

25  court record to "determine what arguments or theories . . . could have supported the state court's

26  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

27  arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

28  Court."  Richter, 562 U.S. at 101.  It remains the petitioner's burden to demonstrate that 'there

9

1  was no reasonable basis for the state court to deny relief.'"  <u>Walker v. Martel</u>, 709 F.3d 925, 939

2  (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

3  　　　　When it is clear, however, that a state court has not reached the merits of a petitioner's

4  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

5  habeas court must review the claim de novo.  <u>Stanley</u>, 633 F.3d at 860 (citing <u>Reynoso v.</u>

6  <u>Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006)).

7  IV.    PETITIONER'S CLAIMS

8  　　　A.  <u>Insufficient Evidence</u>

9  　　　　　1. *The Parties' Positions*

10  　　　　Petitioner challenges the sufficiency of the evidence to support his convictions for

11  robbery, felony murder based on robbery, and the robbery-murder special circumstance.  (ECF

12  No. 1 at 5.)　In his petition for review, petitioner first argued that ordering the two women to put

13  their cell phones on the table was insufficient to demonstrate he was acting with the intent to

14  permanently deprive them of the phones, particularly where he and his co-defendant already had

15  working cell phones.  (<u>Id.</u> at 13.)  Further, had he intended to rob the victims, he would have

16  demanded the rest of their possessions, including cash, drugs, and jewelry the victim wore.

17  Second, petitioner argued there was no evidence that Montoya's death resulted from petitioner's

18  intent to take her cell phone.  Petitioner contends that ordering the women to put their cell phones

19  on the table was more likely to keep them from using them.  Further, petitioner contends there is

20  no evidence he took Montoya's cell phone or her car key, and no evidence he used force with the

21  intent to take her car key.  In any event, the taking of the car key was intended to prevent the car's

22  use or to enable petitioner and his co-defendant to escape because of the shooting.  Third,

23  petitioner argued that because there was insufficient evidence to support a robbery conviction, the

24  evidence was also insufficient to support a felony-murder conviction based on a conclusion that

25  the murder occurred during the robbery or attempted robbery.  Finally, petitioner contended that

26  there was insufficient evidence to support the true finding on the robbery murder special

27  circumstance because there was insufficient evidence to show petitioner shot Montoya during the

28  commission of a robbery, and the taking of Montoya's car key was merely incidental to the

1    murder.  (Id. at 16.)

2          In response, respondent argues there was substantial evidence that petitioner's intent to

3    rob the two women developed before or at the same time he used force because petitioner lured

4    the victims to his hotel room where he immediately pulled a gun on them and demanded they put

5    their cell phones on the table and demanded Montoya's car key.  (ECF No. 18 at 23.)  After the

6    shooting, petitioner and his co-defendant took property from Montoya's pockets, took Archuleta's

7    cash, and escaped in Montoya's car, which they still possessed when police caught up with them

8    the next day.  Respondent contends that petitioner's alternate interpretation of the evidence

9    confirms there was sufficient evidence to support the judgment.  Because there was substantial

10   evidence to demonstrate petitioner developed the intent to steal before or during his use of force,

11   respondent maintains there was also sufficient evidence to find true the robbery-murder special

12   circumstance.  (Id. at 24-25.)

13         Petitioner did not file a reply.

14              2.  Last State Court Opinion

15         The last reasoned rejection of petitioner's first claim is the decision of the California

16   Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court

17   addressed this claim as follows:

18              Defendant contends his convictions for the robbery of both victims
19              and his conviction for felony murder with special circumstances must
                be reversed for insufficient evidence.  We disagree.

20              A.  Standard of Review and Relevant Statutes

21              "'When considering a challenge to the sufficiency of the evidence to
22              support a conviction, we review the entire record in the light most
                favorable to the judgment to determine whether it contains
23              substantial evidence—that is, evidence that is reasonable, credible,
                and of solid value—from which a reasonable trier of fact could find
24              the defendant guilty beyond a reasonable doubt.'  [Citation.]  We
                determine 'whether, after viewing the evidence in the light most
25              favorable to the prosecution, any rational trier of fact could have
                found the essential elements of the crime beyond a reasonable doubt.'
26              [Citation.]  In so doing, a reviewing court 'presumes in support of
                the judgment the existence of every fact the trier could reasonably
27              deduce from the evidence.'"  (People v. Edwards (2013) 57 Cal.4th
                658, 715 (Edwards).)

28

                                          11

"'The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 (*Houston*).)

The jury is entitled to draw reasonable inferences based on the evidence (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166), and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise (*People v. Salazar* (2016) 63 Cal.4th 214, 242. "'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Id.* at p. 357.)

B. *Robbery*

Robbery is the "taking of personal property in the possession of another, from [her] person or immediate presence, and against [her] will, accomplished by means of force or fear" (§ 211), and with the intent to permanently deprive the person of the property. (*People v. Marshall* (1997) 15 Cal.4th 1, 34.) "Robbery . . . has not occurred unless property was taken from the person's immediate presence and the defendant used force or fear to take the property or to prevent the person from resisting." (*People v. Scott* (2009) 45 Cal.4th 743, 749.)

For a taking to constitute robbery, "the evidence must show that the requisite intent to steal arose either before or during the commission of the act of force. [Citation.] '[I]f the intent arose only after the use of force against the victim, the taking will at most constitute a theft.' " (*Marshall, supra*, 15 Cal.4th at p. 34.)

Defendant first contends there was insufficient evidence he intended to permanently deprive the victims of their property. He adds there was insufficient evidence that any intent to steal from the victims arose either before or during the demonstration of force. We disagree.

To support his contention, defendant argues the evidence admitted at trial could be construed as an intent to separate the victims from their property only temporarily. This, he argues, is a "logical" inference from the evidence. Based on his view of the evidence, defendant surmises the phones were taken from the victims so they could not use them to call for help, and the car was taken only to get away from the crime scene. He further argues it would be "illogical" for him to steal a cell phone when he had a functioning cell phone of his own.

As we have explained, our task is to review the entire *record in the light most favorable to the judgment*, and we must presume "'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*Edwards, supra*, 57 Cal.4th at p. 715.)  The judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. (*Houston, supra*, 54 Cal.4th at p. 1215.)  "[I]f the evidence is such that rational people could reach conflicting conclusions, there is by definition substantial evidence to support the judgment." (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1166.)

Here, there was ample evidence from which a reasonable jury could conclude that defendant, with help from Temme, intended before beginning the robbery to permanently deprive the victims of their property.  We have detailed the evidence presented at trial that showed defendant and Temme lured Montoya and Archuleta to defendant's motel room under the pretense that he would give Archuleta a tattoo and sell Montoya and/or Archuleta drugs.  Inside the room, defendant immediately pulled out a gun and demanded the victims' cell phones.  Then Temme ordered Montoya to hand over her car key while defendant had Montoya at gunpoint, and defendant shot Montoya before she even had a chance to comply.  After Montoya was shot, Temme expressed no surprise, but instead immediately went through Montoya's pockets and took items including her car key.

Following the shooting, Archuleta gave defendant all of her money, either Temme or defendant took Archuleta's cell phone, and Temme and defendant fled the scene and left town in Montoya's car.  Finally, defendant and Temme attempted to evade police officers the following day both while driving and on foot.  Temme told Clark during a jail visit that Archuleta was only alive because she had told defendant not to harm her--which there is no evidence happened at the time of the robbery, suggesting an earlier plan.

From all the evidence, a reasonable inference certainly arises that defendant planned with Temme to rob Montoya and Archuleta in an armed ambush that would involve physical violence.  Taken as a whole, defendant's conduct before, during, and after the crimes supports his robbery convictions.  A rational trier of fact could find him guilty of this crime beyond a reasonable doubt.

C. *Felony Murder, Special Circumstances*

"The robbery-murder special circumstance applies to a murder 'committed while the defendant was engaged in . . . the commission of, [or] attempted commission of robbery.' (§ 190.2, subd. (a)(17)(A).)  '[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder.' [Citations.]  To prove a robbery-murder special circumstance, the prosecution must prove the defendant formed the intent to steal before or while killing the victim. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27-28.)

1    Defendant first argues that because there was insufficient evidence
     of robbery, the special circumstances finding must be reversed.
2    Because we have concluded *ante* that sufficient evidence supports
     the robbery convictions, this argument fails.
3
     Next, defendant argues that the robbery, if it occurred, was only
4    "incidental" to the murder and the special circumstance finding must
     be reversed on that ground.   Again, we are not persuaded.   As
5    discussed in greater detail above, the evidence demonstrates that the
     armed defendant and Temme led the victims to a motel room, entered
6    the room before the victims, immediately demanded the victims'
     property (including the car key), killed Montoya when she reacted to
7    the demands, and fled in Montoya's car.  It was reasonable for the
     jury to conclude, based on that evidence, that defendant formed the
8    intent to rob the victims before Montoya's murder.  (See *People v.
     Johnson* (2015) 60 Cal.4th 966, 988 ["The jury could readily
9    conclude defendant intended to steal when he entered the victim's
     house with a weapon and beat her to death.  It did not have to
10   conclude he killed the victim . . . and only then decided to steal."].)
     Thus, the robbery was not *necessarily* merely incidental; although
11   that is a conclusion that could possibly be reached by a reasonable
     jury, it is certainly reasonable to reach a contrary conclusion from
12   the evidence we have described.  We conclude sufficient evidence
     supports the special circumstance.
13
     We note that in his reply brief, defendant argues "[i]n light of the
14   prosecution's explicit claim that Montoya's murder was willful,
     deliberate and premeditated on the day prior to its commission, it
15   follows that the robbery was incidental to the murder and not vice
     versa."  We disagree.  First, defendant's premise is flawed.  At trial
16   the People argued *two* theories by which defendant could be
     convicted of murder: felony murder or premeditated, malice murder.
17   The jury was not required to identify upon which theory they found
     him guilty.  Second, while there may have been evidence to support
18   both theories of guilt, the jury is not required to weigh the evidence
     equally.  We will not reweigh that evidence on appeal.  (See *Houston,
19   supra*, 54 Cal.4th at p. 1215 [courts of appeal do not reweigh
     evidence]; see also *People v. Zamudio, supra*, 43 Cal.4th at p. 357
20   ["reversal for insufficient evidence 'is unwarranted unless it appears
     "that upon no hypothesis whatever is there sufficient substantial
21   evidence to support" ' the jury's verdict"].)  This argument does not
     affect our conclusion that the special circumstance was properly
22   found.

23   (People v. Baca, slip op. at 7-12.)

24          3. *Clearly-Established Federal Law*

25          Due process requires that each essential element of a criminal offense be proven beyond a

26   reasonable doubt.   United States v. Winship, 397 U.S. 358, 364 (1970).  In reviewing the

27   sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in

28   the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

                                              14

1    elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319

2    (1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that

3    the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer

4    to that resolution." <u>Id.</u> at 326.  "A reviewing court may set aside the jury's verdict on the ground

5    of insufficient evidence only if no rational trier of fact could have agreed with the jury." <u>Cavazos</u>

6    <u>v. Smith</u>, 565 U.S. 1, 2 (2011) (per curiam).  In other words, a verdict must stand unless it was

7    "so unsupportable as to fall below the threshold of bare rationality."  <u>Coleman v. Johnson</u>, 566

8    U.S. 650, 656 (2012).

9             4. *Analysis*

10           Here, the resolution of the insufficient evidence claim was not contrary to clearly

11   established federal law because in citing <u>People v. Edwards</u>, 57 Cal. 4th 658, 715 (2013), the state

12   court of appeal quoted from and applied the same standard announced in <u>Jackson v. Virginia</u>, 443

13   U.S. at 319.  (ECF No. 17-10 at 8.)  As a result, habeas relief is only available if petitioner can

14   demonstrate that the state court unreasonably applied the governing legal standards to the facts of

15   his case.  <u>See</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792 (2001) (citing <u>Williams v. Taylor</u>, 529 U.S. at

16   407-08)).  This Court finds that the state court of appeal reasonably concluded that there was

17   sufficient evidence to prove that petitioner committed the murder in the commission of a robbery,

18   as discussed below.

19           Eyewitness Archuleta testified that once all four of them were in the motel room,

20   petitioner immediately pulled a gun and pointed it in the direction of Montoya and Archuleta.

21   Reporter's Transcript ("RT") at 282-83, 353, 371 (ECF No. 17-3).  Archuleta testified that

22   Temme did not seem surprised that petitioner pulled out the gun.  RT at 285.  Petitioner then

23   demanded that Montoya and Archuleta put their cell phones on the table, and Archuleta complied.

24   RT at 283, 354.  Archuleta then heard Temme say "car keys," and petitioner repeated "car keys,"

25   both directed at Montoya, who had the car keys.  RT at 285.  Archuleta testified that before

26   Montoya could respond, petitioner shot Montoya.  RT at 285-86, 297.  After petitioner shot

27   Montoya, Archuleta testified she saw petitioner and Temme rush to Montoya's body, touch her

28   pockets, and grab for stuff.  RT at 289-90.  Archuleta did not see who took her cell phone, but

1    after petitioner and Temme left the room together, Archuleta's phone was not there, and neither

2    was Montoya's.  RT at 290, 300.  Before they left, Archuleta gave petitioner her money because

3    she was scared, and she "wholeheartedly believed [she] was going to die."  RT at 291.

4        On cross-examination, Archuleta confirmed that petitioner and Temme were the first

5    people to leave the motel room.  RT at 366.  Petitioner testified that he had the car key when he

6    and Temme got into Montoya's car.  RT at 864.  Petitioner and Temme left the scene in

7    Montoya's car; after Archuleta left the motel room, she testified that she walked toward Auburn

8    and petitioner and Temme passed her.  RT 299.  Archuleta identified both Temme and petitioner

9    in the courtroom.  RT at 313.  On redirect exam, Archuleta testified that Montoya "didn't ever

10   appear to try to stand up."  RT at 378.  Evidence was presented showing the crimes took place in

11   a matter of minutes.[3]

12       The testimony at petitioner's trial provided evidence that petitioner intended to rob the

13   victim Montoya of her cell phone and car, and that he murdered Montoya while he was engaged

14   in the robbery.  Because there was evidence to support an inference that petitioner intended to rob

15   the victim, clearly established federal law obligated the state court of appeal to defer to the jury's

16   conclusion on that issue.  See Jackson v. Virginia, 443 U.S. at 326.  Petitioner's argument that the

17   evidence supports a different view does not render the jury's verdict constitutionally infirm.  See

18   Cavazos, 565 U.S. at 2; Coleman, 566 U.S. at 656.  Accordingly, the state court's rejection of

19   petitioner's insufficiency of the evidence claim was not contrary to, or an unreasonable

20   application of, clearly established federal law as set forth by the United States Supreme Court.

21   Petitioner is not entitled to habeas relief on his claim challenging the sufficiency of the evidence

22   upon which he was convicted.

23   ///

24

25   [3]  Video from the Surf motel confirmed how quickly the events of March 19, 2017 unfolded.  In
     addition to playing the video for the jury, the prosecution admitted as exhibits still video frames
26   with date and time stamps and labels.  Clerk's Augmented Transcript on Appeal ("CAT") at 7-19
     (ECF No. 17-2 at 10-22).  Montoya's car arrived at the motel at 9:07:36 p.m.  CAT at 7.  The
27   motel door closed at 9:08:45 p.m.  CAT at 16.  At 9:09:26 p.m., 41 seconds later, Temme opened
     the motel door.  CAT at 17.  At 9:09:29 p.m., Temme went to the driver's door of Montoya's car.
28   CAT at 18.  At 9:09:32 p.m., petitioner went to the passenger door of Montoya's car.  CAT at 19.

16

1      B. Exclusion of Impeachment Evidence

2           1. *The Parties' Positions*

3           Petitioner claims that he was denied his right to a fair trial, due process, and the right to

4    present a defense by the exclusion of impeachment evidence.  (ECF No. 1 at 7.)  Petitioner

5    contends that evidence was withheld that would show petitioner acted in self defense and not with

6    the intention to commit a murder, or to steal $30 when he had that amount of money in his own

7    pocket.  (Id.)  In his opening brief on appeal, petitioner argued that the trial court's denial of

8    petitioner's efforts to elicit relevant testimony as to Archuleta's prior convictions and character

9    evidence denied petitioner his right to confront witnesses against him, to a fair trial, and to due

10   process under the Sixth and Fourteenth Amendments.  (ECF No. 17-7 at 28.)

11          In response, respondent first argues that petitioner's claim is procedurally barred because

12   on direct appeal the state court held that a procedural bar applied because petitioner submitted

13   inadequate briefing on this issue.  (ECF No. 18 at 26 (citing ECF No. 17-10 at 14-15).)  Second,

14   respondent contends that errors of state law are not cognizable on federal habeas review, and

15   petitioner "makes only a passing reference to the Constitution in his attempt to have this court

16   decide an ordinary discretionary exclusion of evidence claim."  (Id. at 29.)  Third, respondent

17   argues that the state court's decision on the merits of this claim was reasonable but, in any event,

18   any error in the exclusion of such evidence was harmless.  (Id. at 30-34.)

19          2. *Last Reasoned State Court Opinion*

20          The last reasoned rejection of petitioner's claim is the decision of the California Court of

21   Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

22   this claim as follows:

23          Defendant next contends the trial court abused its discretion in
24          excluding evidence of Archuleta's character and the details of her
             prior convictions.  We find no abuse of discretion.

25        A. *Additional Background*

26          Prior to trial, the People moved to exclude impeachment of Archuleta
27          with any convictions beyond her 2012 theft and 2013 second degree
             robbery convictions.  Defendant filed his own motion pursuant to
             Evidence Code section 1103, seeking to admit character evidence:
28           Archuleta's reputation for anger, violence, deceitful conduct, and

17

performing violent acts in exchange for money.

Defendant also filed a supplemental motion seeking to introduce evidence of Archuleta's 2018 conviction for participation in a criminal street gang (§ 186.22, subd. (a)) and other prior convictions beyond the theft and robbery. Defendant sought to question Archuleta about the facts that the 2013 robbery conviction was for a "home invasion robbery in concert with others," and the conduct underlying her conviction for participation in a criminal street gang included "luring" a man to a hotel room in order to rob him. Defendant further argued he should be able to cross-examine Archuleta regarding numerous social media posts wherein she purportedly advertised performing acts of violence in exchange for money.

At the hearing on the motions in limine, the trial court ruled that Archuleta's prior convictions for theft and robbery were admissible as impeachment evidence. Archuleta's conviction for robbery, the court indicated, must be sanitized because whether the robbery involved force or fear was not relevant to Archuleta's credibility. The court tentatively ruled that Archuleta's 2018 conviction for participation in a criminal street gang was a crime of moral turpitude, but deferred ruling on that issue pending additional research. On the issue of Archuleta's character, the court ruled that evidence was admissible only if defendant testified he acted in self-defense.

Prior to Archuleta's testimony at trial, defendant again objected to sanitizing her prior robbery conviction. Defendant argued it was relevant that the robbery was violent. The trial court affirmed its prior ruling that the conviction could be used to impeach Archuleta but could only be referred to as a "felony conviction involving a theft" or "a felony conviction involving moral turpitude."

The trial court also confirmed its tentative ruling that Archuleta's 2018 conviction for participation in a criminal street gang could be used as impeachment evidence, but without reference to gang affiliation or the underlying criminal conduct. Defendant voiced his objection, arguing that Archuleta's gang affiliation and her participation in a robbery where she was the "bait" to "lure" a victim would further undermine her credibility. The court explained its concern that evidence of Archuleta's gang affiliation and those details of her participation would constitute improper character evidence. The prejudice of those details, it concluded, would outweigh any relevance.

During trial, Archuleta testified wearing her orange, prison-issue clothing. She acknowledged her lengthy criminal record, noting she had been "in and out of juvenile hall and stuff" since she was 16. She also admitted to smoking methamphetamine "socially" on the day in question, and drinking alcohol throughout the day, beginning in the morning. Archuleta testified that in 2012 she was convicted of stealing, she was convicted of another felony theft offense in 2013, and in 2018 she was convicted of an additional felony for which she was in custody at the time of trial.

B. *Applicable Legal Principles*

"'When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify.' [Citation.]" (*Edwards, supra*, 57 Cal.4th at p. 722.)  A prior felony conviction involving moral turpitude is admissible to impeach a witness on the theory that, even if the prior crime did not involve dishonesty, "moral depravity of any kind has some 'tendency in reason' [citation] to shake one's confidence in [the witness's] honesty." (*People v. Castro* (1985) 38 Cal.3d 301, 315; *People v. Gutierrez* (2018) 28 Cal.App.5th 85, 88.)  We review the trial court's decision for abuse of discretion. (*People v. Bedolla* (2018) 28 Cal.App.5th 535, 555.)

C. *Analysis*

After giving a detailed recitation of our Supreme Court's decision in *People v. Dalton* (2019) 7 Cal.5th 166 (*Dalton*), the sum total of defendant's argument is that "the trial court's statements suggested that it may have been unaware that specific instances of misconduct that were relevant to prove a trait of the witness's character were admissible."  Defendant, however, does not identify which of the trial court's statements he is referring to and makes no cogent argument that the trial court misunderstood the law relative to the admissibility of prior misconduct.  The claim is thus forfeited.  (See *Estate of Cairns* (2010) 188 Cal.App.4th 937, 949.)

Moreover, when defendant raised this issue for a second time in the trial court at the hearing on his motion for a new trial, the trial court acknowledged the decision in *Dalton, supra*, 7 Cal.5th 166, but correctly noted it had discretion to exclude evidence under Evidence Code section 352.  The record does not, therefore, support defendant's claim that the court misunderstood its duty to admit relevant evidence.

Finally, even assuming it was error to exclude the additional impeachment evidence, and that error was preserved for appeal and properly raised in the briefing, the claim fails because defendant has not demonstrated how he was prejudiced by the purported error. (*Dalton, supra*, 7 Cal.5th at p. 217 [erroneous exclusion of impeachment evidence is harmless unless there was a reasonable probability the defendant would have achieved a more favorable result had the error not occurred].)  Defendant argues that if the jury had heard details of Archuleta's participation in another hotel robbery, details which he presents as eerily similar as to defendant's version of the happenings at the hotel in this case, it would have questioned Archuleta's credibility.  The argument fails to persuade.

The jury had ample reason to question Archuleta's credibility; her character for dishonesty was made clear at trial.  She wore prison garb and acknowledged she was serving a prison sentence for a crime she committed after Montoya was killed.  She acknowledged having

1
2
3
4
5
6
7
8

> been in the criminal justice system since she was 16 years old.  She admitted to being high on methamphetamine and drinking throughout the day of the murder.  She acknowledged having been convicted of three crimes, two of which were theft-related.  Further details of her underlying crimes and her social media would not have cast her credibility in a significantly different light.  (*Dalton, supra*, 7 Cal.5th at p. 215.)  Further, as we have discussed in detail above, Archuleta's testimony was supported by video evidence as well as defendant and Temme's actions after the killing, including their flight together, and Temme's statements to her aunt and others.  Defendant has failed to establish that he would have received a different result had the excluded evidence been admitted.  (*Ibid.*)  Thus, even assuming for the sake of argument that the claim is preserved and the trial court's ruling was erroneous, any error was harmless.

9    (People v. Baca, slip op. at 12-16.)

10       3.  *Analysis*

11          a.  Procedural Default

12       The Court declines to consider respondent's argument that petitioner's claims are

13   procedurally defaulted.  A reviewing court need not invariably resolve the question of procedural

14   default prior to ruling on the merits of a claim.  Lambrix v. Singletary, 520 U.S. 518, 524-25

15   (1997).  Where deciding the merits of a claim proves to be less complicated and less time-

16   consuming than adjudicating the issue of procedural default, a court may exercise discretion in its

17   management of the case to reject the claim on the merits and forgo an analysis of procedural

18   default.  See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are

19   not infrequently more complex than the merits issues presented by the appeal, so it may well

20   make sense in some instances to proceed to the merits if the result will be the same.").

21          b.  Exclusion of Impeachment Evidence

22       Petitioner's trial counsel attempted to introduce additional impeachment evidence,

23   including facts underlying Archuleta's prior convictions and character evidence relating to her

24   credibility from her social media, and petitioner argues that his inability to do so violated his

25   rights to a fair trial, to present a defense, to confront witnesses and to due process of law.

26       Respondent counters that the trial court had discretion to limit the evidence under

27   California Evidence Code Section 352, and the trial court correctly described its discretion when

28   petitioner raised this claim in the motion for new trial.  (ECF No. 18 at 30 (citing ECF 17-10 at

1    5).)  Respondent argues that the state court's finding that the evidence was properly excluded

2    under section 352 was reasonable, and because there is no clearly established Supreme Court

3    precedent governing petitioner's claim, the state court's decision cannot be contrary to or an

4    unreasonable application of clearly established federal law.  (<u>Id.</u> at 32.)  But even if the trial court

5    committed error in excluding the impeachment evidence, respondent argues that any error was

6    harmless "given the substantial impeachment material permitted and in evidence."  (<u>Id.</u> at 33.)

7                                    i.  Applicable Legal Standards

8            "[I]t is not the province of a federal habeas court to reexamine state court determinations

9    on state law questions."  <u>Estelle</u>, 502 U.S. at 67.  "Incorrect state court evidentiary rulings cannot

10   serve as a basis for habeas relief unless federal constitutional rights are affected."  <u>Whelchel v.</u>

11   <u>Washington</u>, 232 F.3d 1197, 1211 (9th Cir. 2000) (internal quotation marks and citation omitted).

12           A fair trial includes a meaningful opportunity to present a complete defense.  <u>See</u> <u>Holmes</u>

13   <u>v. South Carolina</u>, 547 U.S. 319, 324 (2006); <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986).

14   Nevertheless, the right to present a defense "is not unlimited, but rather is subject to reasonable

15   restrictions, such as evidentiary and procedural rules."  <u>Moses v. Payne</u>, 555 F.3d 742, 757 (9th

16   Cir. 2009) (internal quotation marks and citation omitted).

17           Similarly, "the Confrontation Clause guarantees an *opportunity* for effective cross

18   examination, not cross examination that is effective in whatever way, and to whatever extent, the

19   defense might wish."  <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985) (emphasis in original);

20   <u>Vasquez v. Kirkland</u>, 572 F.3d 1029, 1038 (9th Cir. 2009).  It does not deprive "trial judges . . .

21   [of] wide latitude . . . to impose reasonable limits on such cross-examination based on concerns

22   about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or

23   interrogation that is repetitive or only marginally relevant."  <u>See</u> <u>Delaware v. Van Arsdall</u>, 475

24   U.S. 673, 679 (1986).

25           Due process is not violated by the exclusion of evidence that is only marginally relevant,

26   repetitive, or more prejudicial than probative.  <u>See</u> <u>Crane</u>, 476 U.S. at 689-90; <u>Taylor v. Illinois</u>,

27   484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that

28   is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").  The

1  right to present a meaningful defense is implicated when exclusionary rules infringe upon a

2  "weighty interest of the accused" and are "arbitrary or disproportionate to the purposes they are

3  designed to serve." Holmes, 547 U.S. at 324 (internal quotation marks and citations omitted).

4  "Only rarely" has the Supreme Court "held that the right to present a complete defense was

5  violated by the exclusion of defense evidence under a state rule of evidence." Nevada v. Jackson,

6  569 U.S. 505, 509 (2013).  "In general, it has taken unusually compelling circumstances . . . to

7  outweigh the strong state interest in administration of its trials." Moses, 555 F.3d at 757 (quoting

8  Perry v. Rushen, 713 F.2d 1447, 1452 (9th Cir. 1983)) (internal quotation marks omitted).

9          Moreover, even if the court finds that the trial court committed a constitutional error in

10  excluding evidence, the petitioner must show that such error had a substantial and injurious effect

11  or influence on the jury's verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see also

12  Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (even if state court does not apply the test for assessing

13  prejudice under federal standards, the Brecht standard applies uniformly in federal habeas corpus

14  cases under § 2254); Moses, 555 F.3d at 760 (even where exclusion of evidence was

15  constitutional error, habeas relief not warranted unless harmless error standard is satisfied);

16                                      ii.  Discussion

17          To the extent that petitioner argues that the trial court erroneously applied California

18  Evidence Code § 352 to exclude impeachment evidence against Archuleta, such claim is

19  unavailing.  See Estelle, 502 U.S. at 67-78 (violation of state law is not cognizable on federal

20  habeas).

21          The United States Supreme Court has not "squarely addressed" whether a state court's

22  exercise of discretion to exclude testimony violates a criminal defendant's right to present

23  relevant evidence.  Moses, 555 F.3d at 758-59.  Further, the Supreme Court has not clearly

24  established a "controlling legal standard" for evaluating discretionary decisions to exclude such

25  evidence.  Id. at 758; see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the

26  issuance of Moses and the present, the Supreme Court has not decided any case either 'squarely

27  address[ing]' the discretionary exclusion of evidence and the right to present a complete defense

28  or 'establish[ing] a controlling legal standard' for evaluating such exclusions.").  In addition, the

1    Supreme Court later held that its precedent did not clearly establish that the Constitution "requires

2    a case-by-case balancing of interests" before a state rule precluding the admission of extrinsic

3    evidence to impeach a witness could be enforced.  Nevada, 569 U.S. at 510.  The Supreme Court

4    stated it "has never held that the Confrontation Clause entitles a criminal defendant to introduce

5    extrinsic evidence for impeachment purposes."  Nevada, 569 U.S. at 509-11 (exclusion of

6    evidence under state law for the purpose of focusing the fact-finder and conserving judicial

7    resources was appropriate and did not impinge on a defendant's right to present a complete

8    defense.).

9          The Ninth Circuit has observed that "under AEDPA, 'even clearly erroneous' evidentiary

10   errors 'that render a trial fundamentally unfair may not permit the grant of federal habeas corpus

11   relief if not forbidden by 'clearly established federal law,' as laid out by the Supreme Court.'"

12   Hale v. Cate, 530 F. App'x 636, 637 (9th Cir. 2013) (quoting Holley v. Yarborough, 568 F.3d

13   1091, 1101 (9th Cir. 2009)).  Moses only addressed the exclusion of expert testimony under a

14   Washington state statute.  However, both the Ninth Circuit and district courts in this circuit have

15   extended the holding in Moses to foreclose habeas claims contending that exclusion of other, non-

16   expert evidence by state courts was contrary to, or an unreasonable application of, controlling

17   Supreme Court precedent, or justified habeas relief under AEDPA.  See, e.g., Smith v. Small, 697

18   F. App'x 538 (9th Cir. 2017) (California court's decision to exclude testimony of three defense

19   witnesses was not contrary to or an unreasonable application of clearly established Supreme

20   Court precedent); Borges v. Davey, 656 F. App'x 303, 304 (9th Cir. 2016) (California court's

21   exclusion of proposed cross-examination pursuant to Cal. Evid. Code § 352 because questioning

22   would be cumulative and time-consuming did not warrant habeas relief under AEDPA); Dugger

23   v. Brown, 469 F. App'x 534 (9th Cir. 2012) (Supreme Court has established no controlling legal

24   standards to evaluate a state court's decision to preclude defense impeachment testimony under

25   Cal. Evid. Code § 352); see also Gentry v. Grounds, 2015 WL 3733395, at *10 (E.D. Cal. June

26   11, 2015) (state court's decision to exclude defense impeachment evidence under Cal. Evid. Code

27   § 352 did not violate any clearly established federal law under § 2254(d)), findings and

28   recommendations adopted, No. 2:13-cv-0142 WBS KJN P (E.D. Cal. July 10, 2015); Chein v.

23

1   Powers, 2013 WL 6535301, at *10 (C.D. Cal. Dec.13, 2013) (state trial court's exclusion of

2   proposed defense evidence regarding conduct of victim because it was irrelevant did not warrant

3   habeas relief under AEDPA).

4       Thus, this Court finds that there is no clearly established federal law that a state court's

5   application of California Evidence Code § 352 may violate due process.  See Smith v. Small, 697

6   F. App'x at 538; Borges, 656 F. App'x at 303; Dugger, 469 F. App'x at 534.  Because these

7   authorities demonstrate that petitioner's claim is not supported by clearly established federal law,

8   the Court cannot find that the exclusion of the additional impeachment evidence was contrary to

9   or an unreasonable application of clearly established federal law.

10      But even assuming that limiting the impeachment evidence as to Archuleta rendered

11  petitioner's trial fundamentally unfair, such claim would fail.  There was sufficient evidence

12  against petitioner, and the trial court permitted Archuleta to be impeached with questions

13  regarding her prior convictions and her drug use the day of the murder.  Specifically, the record

14  evidence demonstrates that Archuleta testified wearing her prison attire reflecting she was

15  currently in custody for a felony conviction she sustained in 2018.  RT at 307.  Archuleta

16  admitted she was previously convicted of a felony in 2013, and had been convicted of

17  misdemeanor theft.  Id.  On cross-examination, Archuleta admitted that she was forced to testify

18  because she would have been charged as an accessory if she refused.  RT at 314-15.  Archuleta

19  admitted she was high and intoxicated on the day of the murder.  RT at 322.  On cross-

20  examination by Temme's attorney, Archuleta confirmed she was on warrant status at the time of

21  the murder.  RT at 367.  Archuleta confirmed she drank about a pint of whiskey, and smoked

22  methamphetamine with Montoya.  RT at 373-74.  Between the methamphetamine and the

23  alcohol, Archuleta confirmed they caused her not to pay attention too much -- she was "kind of

24  tipsy, and not really focusing on everything, but still paying attention to things."  RT 375.

25  Archuleta confirmed that once petitioner took out the gun, she was focused on the gun.  RT at

26  377.  Considering the impeachment evidence already presented, the Court finds the failure to

27  admit additional details about her convictions or her social media would not have had a

28  substantial and injurious effect or influence in determining the jury's verdict.  Brecht v.

1    Abrahamson, 507 U.S. 619, 638 (1993); see Moses, 555 F.3d at 760 ("In light of the evidence

2    admitted by the trial court, even assuming that the trial court's exclusion of evidence was a

3    constitutional error, we agree that it did not have 'substantial and injurious effect or influence in

4    determining the jury's verdict.'").  Thus, petitioner is not entitled to habeas relief on his second

5    claim.

6    V.    CONCLUSION

7         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

8    habeas corpus be denied.

9         These findings and recommendations are submitted to the United States District Judge

10   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

11   after being served with these findings and recommendations, any party may file written

12   objections with the court and serve a copy on all parties.  Such a document should be captioned

13   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

14   he shall also address whether a certificate of appealability should issue and, if so, why and as to

15   which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

16   applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

17   § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

18   service of the objections.  The parties are advised that failure to file objections within the

19   specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

20   F.2d 1153 (9th Cir. 1991).

21

22   Dated:  April 3, 2025

23

24                                        CHI SOO KIM
                                          UNITED STATES MAGISTRATE JUDGE
25   /1/baca1481.157

26

27

28

                                          25